Loren W. WALTERS and Lucille K.
Walters, Plaintiffs–Respondents,

v.

William A. MALONEY and Norman O.
Chaney, Defendants–Appellants.

No. 15397.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 4, 1988.

Emory Melton, Cassville, Robert S. Wiley, Crane, for defendants-appellants.

David F. Sullivan, Springfield, for plaintiffs-respondents.

FLANIGAN, Presiding Judge.

Plaintiffs Loren Walters and Lucille Walters, husband and wife, brought this action in fraud against their real estate brokers, defendants William Maloney and Norman Chaney. The dispute arises from the sale of plaintiffs' residence in Cassville to Irvin Hampton and Helen Hampton, husband and wife. Defendant Maloney is the broker who figured principally in the transaction. Defendant Chaney does business under the name "Ozarks Realty" and defendant Maloney is the manager of Chaney's real estate office.

In general it is plaintiffs' theory that they were defrauded in that Maloney and Chaney failed to inform them of the involvement of the Boatmen's National Bank of Cassville ("the bank") in the sale. The bank made a $50,000 loan to the Hamptons, the proceeds of which they applied to the purchase price of $85,000 which they had agreed to pay plaintiffs. The Hamptons gave the bank a first deed of trust securing the $50,000 loan and gave the plaintiffs a second deed of trust securing the unpaid balance, $34,900, due the plaintiffs on the purchase price. The Hamptons had earlier paid $100 in the form of an earnest money deposit. Later the Hamptons sustained financial reverses, the property was sold, the Hamptons' indebtedness to the bank was satisfied in full, and the plaintiffs realized only $17,339.11 on the loan secured by their second deed of trust.

A jury found the issues generally in favor of the plaintiffs and against both defendants and awarded actual damages in the sum of $23,000 but denied plaintiffs' claim for punitive damages. Defendants appeal.

In general defendants' contentions on this appeal are: (1) the petition is fatally defective in failing to plead, or inadequately pleading, certain elements of an action in fraud; (2) the evidence is insufficient to support the verdict against either defendant because certain elements of an action in fraud were not shown; (3) the separate verdict-directing instructions against the two defendants were erroneous; and (4) the evidence is insufficient to support the verdict against defendant Chaney for reasons in addition to those raised in point 2.

On September 4, 1984, plaintiffs and defendants signed a "Listing Agreement," by the terms of which defendants were authorized to find a buyer for plaintiffs' residence at a sale price of "$88,900 and terms of cash or as otherwise agreed to."

On March 12, 1985, defendant Maloney, pursuant to the listing agreement, showed the property to Mr. and Mrs. Hampton, and the Hamptons, as buyers, signed a printed "Contract for the Sale of Real Estate." The plaintiffs, as sellers, signed it later the same day.

The contract contained the following typewritten provision:

"Buyer offers to purchase as follows:

| $85,000.00 | selling price |
| 50,000.00 | at closing |
| $35,000.00 | |
| 100.00 | earnest money |
| $34,900.00 | due within 120 days from date of closing or upon possession date which is agreed upon mutually if sooner." |

The contract also contained the following provisions, the underlined portions of which were typewritten:

"The price for said property shall be <u>Eighty five thousand and No/100</u> Dollars; to be paid by Buyer as follows: <u>$100</u> at the time of the execution and delivery of this

contract, the receipt of which is hereby acknowledged by the Seller, and which is deposited with [Defendants'] Escrow Account as agent for the Seller, as earnest money, and as a part of the purchase price and consideration for this agreement, ...

.    .    .    .    .

"The sale under this contract shall be closed at the office of Joe Ellis, attorney in Cassville, Missouri, on or before the 12th day of April, 1985, at 10:00 o'clock A.M. or at such other time and place as the parties may mutually agree....

"Possession shall be delivered to the Buyer at the time of closing or within 120 days thereafter, subject to the rights of the owners who occup[y] the premises.

.    .    .    .    .

"If the title to said real property be marketable in fact as called for herein, the Seller shall deliver for the Buyer at the office of said Seller's agent a general warranty deed free and clear from all liens and encumbrances whatsoever, except as herein provided, and the Buyer shall then and there pay the balance, if any, of said cash payment and deliver to the Seller the note and deed of trust, if any, hereinbefore provided for."

On March 26, three days prior to the closing, buyer Hampton talked with Cherry Warren, executive vice-president of the bank, and made arrangements for the obtaining of a $50,000 loan, the proceeds of which were to be used by Hampton in making the $50,000 initial payment to the plaintiffs.

Also on March 26 defendant Maloney received a telephone call from the secretary of attorney Joe Ellis. The secretary informed Maloney "that there was going to be bank money involved."

At the trial Maloney testified: "[T]he secretary] asked me, 'Do you know there is going to be a first deed of trust with Boatmen's Bank on the property?' and I said, 'No.' I was dumbfounded. I said, 'I did not know that,' and I said, 'We've got a new ball game now ... Loren agreed to a promissory note ... He can't do that no more.... I'll tell Loren that there's bank

money involved, and we need to talk to him and explain this to him, so he can back out of the deal, if he wants.'"

Maloney also testified that later on March 26 he telephoned Walters and said, "Loren, we've got a little problem. There's bank money involved now." At the trial Maloney testified: "The reason I can't tell him about a deed of trust and even discuss a deed of trust in detail and ramification is that Hulse versus Krieger says a broker can't do it. All I said at that point was, 'There is bank money involved.'" Maloney also testified, "We wanted to go see Joe Ellis, so I could get Joe to explain in detail what was going to happen and if they wanted to go through with the transaction." Maloney testified that he did not at any time prior to the closing tell the Walters "that Mr. and Mrs. Hampton were borrowing $50,000 from a bank, and the bank would have a first mortgage on their home."

On March 29, 1985, the "closing" of the sale was held at the office of attorney Joe Ellis. Present at the closing were the two plaintiffs-sellers, the two buyers, defendant Maloney and attorney Ellis. At the jury trial all of these people were called as plaintiffs' witnesses.

Although the testimony of the two plaintiffs differed widely from the testimony of the other witnesses with regard to what was said at the closing, there is no dispute with regard to what documents were executed at that time. The documents included: .

Exhibit 3—A warranty deed by which the plaintiffs conveyed the property to the Hamptons.

Exhibit 5—A "Seller's Statement," signed by the plaintiffs and by defendant Maloney. This document listed certain charges to the sellers, including "2nd Deed of Trust ... $34,900." Other charges to the sellers, deducted from the sale price of $85,000, included charges for tax adjustments, abstracting, preparation of warranty deed, and sales commission. After deduction of those charges the sellers were entitled to a check in the amount of $45,210.74. Exhibit 5 also recited that the sell-

ers had examined and received a copy of it and Exhibit 6.

Exhibit 6—A document entitled "Receipts and Disbursements." Among the contents of that document is the following, the typewritten portions of which are underlined:

"Name of Buyer Irvin C. and Helen L. Hampton
Name of Seller Loren and Lucille Walters
Address of property purchased Rural Route 1,
                                                        Cassville, MO 65625

| Receipts | Amount |
|---|---|
| Escrow Deposit from Buyer | $100.00 |
| Loan for Buyer from: Boatmen's Bank, | |
| Cassville, MO 1st DOT | 50,000.00 |
| Loren and Lucille Walters | |
| 2nd DOT | 34,900.00 |
| Insurance Adjustment (Credit) | 225.34 |
| Balance from Buyer | |
| Total Receipts | 85,225.34" |

Exhibit 7—"Deed of Trust" executed by the Hamptons in favor of the bank securing a note in the amount of $50,000. The note itself had been signed by the Hamptons earlier that day at the bank.

Exhibit 8—"Second Deed of Trust" executed by the Hamptons in favor of the plaintiffs securing a note in the amount of $34,900. This deed of trust recited that it was subject to the deed of trust, Exhibit 7, in favor of the bank.

Exhibit 9—Note signed by the Hamptons in favor of the plaintiffs in the amount of $34,900. The note recited that the principal sum of $34,900 was to bear no interest and was to be paid in full 120 days from its date (March 29, 1985).

Plaintiff Loren Walters testified that at no time prior to or during the closing did defendant Maloney tell him anything about "bank money or that there was going to be a first deed of trust.... No one told me that the bank was loaning the Hamptons $50,000 and I was taking a second mortgage." Walters also testified that he did not read any of the documents which he signed at the closing, that he was not given the opportunity to read any of them, and that "it was the fastest signing you have ever seen."

Walters testified that at the closing Maloney presented the "papers" to him and his wife. According to Walters, Maloney said, " 'These are all ready to sign. Joe's got them ready,' and he opened them up where we was to sign, just like this, said, 'Loren, you sign there, and Lucille, you sign under it,' and the next one that was supposed to be signed. We never seen the heading of a paper up there, or we didn't even have time to look at it.... Maloney handed the documents over to me. He held onto them, like I said, at the top of the documents. He turned up what I was to sign. He had—started on the bottom signing, and he dropped them down one at a time that I was supposed to sign and I believe we signed about four. I'm not sure about that. I signed whatever he told me to sign ... and then he he went to Lucille to get her signature, just right next to me. All he had to do was reach across in front of her, too, and then he handed the papers over to the Hamptons."

Mrs. Walters testified that the closing did not last over ten minutes. She said that attorney Ellis "brought the papers in" and handed them to Maloney and said, "They're ready to sign." She then testified, "Bill Maloney then reached across me over to Loren around the side and had ahold of the papers. He never even turned them loose. He held—Loren signed here. He turned it up, 'Sign here,' and then he came over to me. He said, 'Lucille, you sign right under Loren.' I signed my

name. He takes them back because they were all together, took them and handed them to Mr. Hampton that was sitting there.... No one—I mean no one—ever mentioned a second mortgage to my husband and I."

Walters admitted that Exhibits 5, 6, and 9 were given him at the closing. Walters admitted that he and his wife had signed Exhibit 5 at the closing. Walters testified he did not see Exhibit 8 at the closing. Exhibit 8 was mailed to the recorder's office for recording and, after it was recorded, the recorder mailed it to the bank rather than to the Walters.

Walters testified that "the first clue I had about the second mortgage" was in June 1985 when an Oklahoma lawyer telephoned Mrs. Walters and told her that the Hamptons were in financial trouble. Mrs. Walters' testimony was substantially in accord with that of her husband.

The other persons who were present at the closing controverted the testimony of the two plaintiffs. Defendant Maloney testified that he, Maloney, explained to the Walters each item on Exhibits 5 and 6. All of the persons present at the closing, except the Walters, testified that attorney Ellis explained all the documents to the Walters and told them that the bank's deed of trust was superior to their second deed of trust. Attorney Ellis testified that he also told the Walters that they needed the second mortgage "as additional security because they just had an unsecured note." These explanations were given, so these witnesses said, before the Walters signed any documents at the closing.

■ The elements of fraud are: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity, or his ignorance of its truth, (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of the falsity of the representation, (7) the hearer's reliance on the representation being true, (8) his right to rely thereon, and (9) the hearer's consequent and proximately caused injury. *Sofka v. Thal,* 662 S.W.2d 502, 506[2] (Mo. banc 1983). "Concealment of a material fact of a transaction, which a party has a duty to disclose, constitutes fraud as actual as by affirmative misrepresentation." *Daffin v. Daffin,* 567 S.W.2d 672, 677[3] (Mo.App.1978).

■ Defendants' first point is that the petition was fatally defective because it did not plead elements 5, 6, 7 or 8, nor did it plead "any facts or circumstances indicating in what manner any alleged nondisclosure was fraudulent."

Rule 55.15 [1] reads, in pertinent part: "In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity...."

The sufficiency of certain allegations of the petition has not been challenged. They include: plaintiffs' ownership of the described real estate; the listing agreement between plaintiffs and defendants-brokers; the contents of the contract of March 12, 1985, entered into by plaintiffs and the Hamptons; the holding of the closing on March 29, 1985; the receipt by plaintiffs of the $50,000 payment and Exhibit 9; the execution by the Hamptons of Exhibit 7 and Exhibit 8; the failure of the Hamptons to pay Exhibit 9; and plaintiffs' damage by reason of the nonpayment. It should be noted that defendants have not challenged the adequacy of the petition with respect to pleading elements 1, 2, 3, 4 and 9.

Pertinent to defendants' first point are the following additional allegations contained in the petition:

"10. The terms of said closing were to be as follows:

(a) Plaintiffs were to receive the sum of $50,000 in cash; and

(b) The balance of the purchase price of $34,900 was to be paid in accordance with the terms of a promissory note to be executed by Defendants Hampton, which note was to be secured by a first deed of trust lien, in favor of Plaintiffs, against the said real property.

.    .    .    .    .

---

1. All references to rules are to Missouri Rules of Court, V.A.M.R.

"12. ... [T]he deed of trust, executed by [the Hamptons] in favor of Plaintiffs, was prepared and/or recorded in such manner so that the promissory note became secured by a second deed of trust lien instead of a first deed of trust lien. A copy of the deed of trust executed by [the Hamptons] in favor of Plaintiffs is attached hereto, [Exhibit 8], and incorporated herein by reference. A copy of a deed of trust executed by [the Hamptons] in favor of Boatmens Bank of Cassville, Missouri, [Exhibit 7], is attached hereto and incorporated herein by reference.

"13. At all times relevant to this real estate transaction, Defendants Norman Chaney and William Maloney knew that the deed of trust lien to be granted by [the Hamptons] to Plaintiffs would be inferior and subordinate to that of said bank, but said Defendants intentionally failed to disclose this fact to Plaintiffs.

"14. The fact referred to in paragraph 13 above was a material fact, and had Plaintiffs been informed of that fact, they would not have entered into the contract for sale with [the Hamptons] nor would they have agreed to the closing of said real estate transaction.

.        .        .        .        .

"16. As a result of the intentional misrepresentation and failure to disclose the aforementioned material fact by Defendants Norman Chaney and William Maloney, Plaintiffs have sustained damages in the sum of $34,900.00, ..."

Element 6 is adequately pleaded. Paragraph 13 pleads an intentional nondisclosure, by defendants to plaintiffs, of a specific fact, and paragraph 14 pleads that the fact was a material one. The language in paragraph 14, "had Plaintiffs been informed of that fact," is inartful, but it may be construed to mean that plaintiffs were not informed of that fact. Rule 55.24 re-

quires a pleading to be construed so as to do substantial justice. Paragraph 14 alleges that plaintiffs would not have agreed to the closing if they had been informed of that fact. Coupled with the allegation that the closing was held, paragraphs 13 and 14 are sufficient to plead element 6.

Element 7 is adequately pleaded by paragraph 14, coupled with the allegation that the closing was held.

Element 8 is sufficiently pleaded by the allegations concerning the listing agreement between plaintiffs and defendants-brokers. Moreover, neither in the trial court nor in this court have defendants claimed that there was no duty on their part, as plaintiffs' brokers, to disclose to plaintiffs the bank's involvement in the sale, including the execution of Exhibit 7 and Exhibit 8. See *Dittmeier v. Missouri Real Estate Commission*, 237 S.W.2d 201, 206[7, 8] (Mo.App.1951). Throughout, defendants' theory has been that the duty existed and that it was performed.

Element 5 is sufficiently pleaded by the allegations pertaining to the listing agreement, the contents of the contract of March 12, 1985, and paragraphs 10, 12, 13, 14 and 16 of the petition.

In arguing that the petition fails to plead "any facts or circumstances indicating in what manner any alleged nondisclosure was fraudulent," defendants do not specify what additional facts or circumstances should have been, but were not, pleaded. In the trial court defendants did not file a motion for a more definite statement of any matter contained in the petition.

Defendants argue, properly, that there was nothing in the contract of March 12 which prevented the Hamptons from borrowing money from the bank. They also argue that the contract of March 12 made no provision for the plaintiffs to receive any deed of trust on the property.[2] How-

---

2. In making this argument, defendants make no mention of the presence or possible legal effect of the following language in the March 12 contract:

"[U]pon delivery of the deed as hereinafter provided, the Buyer shall pay the balance of the purchase price to Seller as follows: if Seller

agrees to finance part of the purchase price as hereinafter set forth, then by delivering the note and deed of trust as hereinafter provided; or if Buyer is assuming and agreeing to pay the note secured by a deed of trust which is presently outstanding as hereinafter set forth, then by Buyer accepting delivery of a deed containing

ever, paragraph 10(b) alleges that the "terms of said closing were to [include]" a first deed of trust to be taken by plaintiffs as security for the $34,900 note of the Hamptons. Whether such a "term" could be found in or implied from the language of the contract, including the language quoted in footnote 2, need not be considered. There was no reason why the plaintiffs and the Hamptons could not, after March 12 and before the closing, agree to such a "term." Although there was no *proof* of such a later agreement at the trial, that does not affect the adequacy of the allegation itself. It must be kept in mind that defendants' first point deals with the adequacy of the petition and not with the adequacy of the evidence. It is also significant that the material nondisclosure, relied on by plaintiffs to satisfy elements 1 and 3, was set forth in paragraph 13. That paragraph dealt with the execution of Exhibit 8, which was the second deed of trust and which contained a specific recital that it was subject to Exhibit 7, the bank's first deed of trust. Whether or not, under the agreement of March 12, the plaintiffs were entitled to receive a first deed of trust in their favor, it cannot be properly claimed that plaintiffs were under any contractual duty to accept a second deed of trust containing such a recital.[3]

In their argument under the first point defendants stress that at the closing plaintiffs were given Exhibits 5 and 6. The adequacy of the petition, however, is not affected by the nature of the evidence the defendants may have adduced at the trial to controvert its allegations. Defendants' first point has no merit.

In general defendants' second point is that the plaintiffs failed to make a submissible case in fraud and that the trial court erred in overruling their in-trial motions for a directed verdict.

In determining whether plaintiffs made a submissible case, this court must review the evidence in the light most favorable to plaintiffs and give them the benefit of all inferences which may reasonably be drawn and which support the petition. *Smith v. Allied Supermarkets, Inc.*, 524 S.W.2d 848, 849[1] (Mo. banc 1975). Plaintiffs had the burden to produce substantial evidence supporting every element of their cause of action. No fact essential to submissibility may be inferred in the absence of a substantial evidentiary basis. *Minnesota Mining & Mfg. Co., v. Williamson*, 675 S.W.2d 951, 953[3] (Mo.App.1984). Although the burden of proof was on plaintiffs, "in a fraudulent misrepresentation case tried to

---

the assumption agreement; and by delivery to Seller the remaining balance of the purchase price, if any, in cash or by certified check.

"... [A]ny Financing or Special Agreements, all as set forth below and on the reverse side hereof, are hereby made a part of this contract....

FINANCING AGREEMENTS
(Only those paragraphs which are completed shall be applicable)
A. ...
B. Seller agrees to finance a part of the purchase price in the amount of $_____ to be evidenced by a negotiable purchase money promissory note in a form approved by Seller to be amortized in equal monthly installments over a period of _____ years bearing interest at the rate of _____ per cent per annum and secured by a _____ deed of trust in a form approved by Seller and covering the property described above.
   ..."

**3.** At no time has either defendant claimed that the documents executed at the closing carried out the original intent of the agreement of March 12 and that plaintiffs merely did what

the contract required them to do. Cf. *Field v. National City Bank of St. Louis*, 343 Mo. 419, 121 S.W.2d 769, 774 (Mo.1938), where the court said, "One suffers no damage where he is fraudulently induced to do something which he is under legal obligation to do...." See also 37 Am.Jur.2d Fraud and Deceit § 295, pp. 392–393, where it is said, "A person who has been induced to do that which the law would otherwise have required him to do cannot claim to be defrauded. In other words, one suffers no damage where he is fraudulently induced to do something which he is under legal obligation to do, such as ... perform a valid contract."

It may be that the possible legal effect of plaintiffs' acceptance of Exhibit 8 upon their vendor's lien for the balance of the purchase price was a factor in defendants' thinking. Cf. *Radar v. Dawes*, 651 S.W.2d 629 (Mo.App.1983), for a discussion of priorities bewteen a vendor's lien and a down payment mortgage given to a third person. In the case at bar the fact is that the bank's lien was given priority over that of the Walters. This court expresses no opinion on whether the bank's lien was entitled to priority if the issue had been raised.

a jury, the burden of proof is not greater than in any other cases tried to a jury," *Crawford v. Smith*, 470 S.W.2d 529, 531–532 (Mo. banc 1971), and the proper burden of proof instruction is MAI 3.01. Id.

Defendants, in the first prong of their second point, contend that plaintiffs' evidence "conclusively established" that Exhibit 7 (the bank's first deed of trust) and Exhibit 8 (plaintiffs' second deed of trust) were disclosed to plaintiffs at the closing by attorney Ellis and by Exhibit 5 (the "seller's statement") and Exhibit 6 ("receipts and disbursements") which were given to plaintiffs at the closing. Defendants say, "The disclosure of the information [on Exhibit 5 and Exhibit 6] given to the plaintiffs at the closing, in writing, conclusively proves that disclosure was made and conclusively negates any reliance by plaintiffs or right to rely on the alleged nondisclosure."

The client-real estate broker relationship which existed between plaintiffs and defendants was one involving trust and confidence. *Emily v. Bayne*, 371 S.W.2d 663, 670[11] (Mo.App.1963). Although it is true that both plaintiffs signed Exhibit 5 at the closing and that Exhibit 5 recited that plaintiffs had examined and received a copy of it and Exhibit 6, plaintiffs also testified that they did not read any of the documents at the closing and that they were not given the opportunity to do so. Both of them described the manner in which defendant Maloney presented Exhibit 3 and Exhibit 5 to them for their respective signatures. Maloney "held onto them ... at the top of the documents. We never seen the heading of a paper up there or we didn't even have time to look at it." Plaintiffs testified that Maloney did not inform them about "bank money or that there was going to be a first deed or trust ... or that the bank was loaning the Hamptons $50,-000 and [plaintiffs] was [sic] taking a second mortgage."

■ Although other persons present at the closing, who disputed plaintiffs' own testimony on the foregoing matters, were called as plaintiffs' witnesses, this court, in determining the issue of submissibility, must give the plaintiffs the benefit of their own testimony as distinguished from the testimony of their other witnesses. *Moore v. Quality Dairy Co.*, 425 S.W.2d 261, 265 (Mo.App.1968). "[A] party is not bound by the testimony of one of his witnesses in so far as such testimony is contradicted by that party's other evidence." *Young v. Kansas City Southern Railway Company*, 374 S.W.2d 150, 153[3] (Mo.1964). "A plaintiff is not conclusively bound by the adverse testimony of a witness unless such testimony is the only evidence before the court on the particular issue." *Ennis v. Korb*, 347 S.W.2d 671, 676[3] (Mo.1961).

Were plaintiffs conclusively bound by the contents of Exhibit 5 which they admittedly signed and received?

■ A person who is sui juris and who intentionally signs a paper is, *in the absence of fraud* or mistake, conclusively presumed to know its contents. *Ensler v. Missouri Pac. R. Co.*, 324 Mo. 530, 23 S.W.2d 1034, 1037[2] (Mo.1930).

In *Wood v. Robertson*, 245 S.W.2d 80, 84[4] (Mo.1952), the court said:

"[W]here the means of knowledge are at hand and are equally available to both parties and the subject matter is alike open to their investigation, if one of them does not avail himself of those means and opportunities he will not be heard to say that he was deceived by the other party's misrepresentation, *if there be no confidential relationship between the parties and if no fraudulent devices have been practiced upon the one alleged to have been defrauded to induce him to refrain from making an inquiry, or to anesthetize his sense of caution.... But the contrary is true where the alleged fraud-feasor fraudulently induces his adversary to refrain from inquiry as where the fraud-feasor has, or by calculation and artifice obtains, the confidence of the other and causes him to forgo the exercise of caution.*" (Emphasis added.)

Similarly in *Feeney v. Cook*, 242 S.W.2d 524, 529[3] (Mo.1951), the court said:

"It is a general doctrine that, if either party to a transaction conceals some fact which is material, which fact is within his own knowledge, and which it is his duty to disclose, he is guilty of fraud. * * * *'If in addition to the party's silence there is any statement, even any word or act on his part, which tends affirmatively to a suppression of the truth, to a covering up or disguising the truth, or to a withdrawal or distraction of the other party's attention or observation from the real facts, then the line is overstepped, and the concealment becomes fraudulent.'"* (Emphasis added.)

■ Although each of the plaintiffs was an intelligent person, with a business background and with prior experience with mortgages, their testimony with regard to their lack of knowledge of the bank's involvement, their ignorance of the existence of Exhibit 7 and Exhibit 8, coupled with their testimony with regard to the manner in which Maloney manipulated Exhibits 3 and 5 at the closing constituted substantial evidence that Maloney "anesthetized" their sense of caution. The first prong of defendants' second point has no merit.

In the second prong of their second point defendants state: "Plaintiffs proved no fraudulent conduct by defendants in that there was nothing in the contract of March 12, 1985, to preclude the buyers from giving a first deed of trust on the property to [the bank] or to require that plaintiffs receive a second deed of trust on the property and any failure to disclose either deed of trust cannot be deemed fraudulent.

"Therefore, the verdict and the judgment are against the weight of the evidence."

Whether a jury verdict is against the weight of the evidence is a question for the trial court alone. *Wilcox v. Coons*, 362 Mo.

381, 241 S.W.2d 907, 917[25] (1951); *Mayfield v. Metropolitan Life Insurance*, 585 S.W.2d 163, 164[2] (Mo.App.1979). "The statement that the verdict is against the greater weight of the credible evidence presents nothing for review because appellate courts do not weigh the evidence in a case tried before a jury." *State ex rel. State Highway Commission v. Twin Lakes Golf Club, Inc.*, 470 S.W.2d 313, 315[3] (Mo.1971). See also *Neavill v. Klemp*, 427 S.W.2d 446, 449[13] (Mo.1968); *Homeyer v. Wyandotte Chemical Corp.*, 421 S.W.2d 306, 309[3] (Mo.1967).

If the second prong of defendants' second point is directed solely to the weight of the evidence, it presents nothing for appellate review. If, charitably construed, the second prong challenges the sufficiency of the evidence, much of the discussion earlier in this opinion demonstrates its invalidity. Although there was nothing in the contract of March 12 to preclude the buyers from obtaining a loan from the bank, the fraud consisted, under plaintiffs' trial theory, of defendants' nondisclosure of the existence of Exhibits 7 and 8. The second prong of defendants' second point has no merit.

Defendants' third point is that the trial court erred in giving, over their objections, Instruction 6 and Instruction 7. Instruction 6, set out marginally,[4] was plaintiffs' verdict-director against defendant Maloney. Instruction 7 was plaintiffs' verdict director against defendant Chaney. The only difference between Instruction 7 and Instruction 6 is that in each of the three places where Instruction 6 mentions "Defendant Maloney," Instruction 7 substitutes the language "Defendant Chaney." Both instructions are based on MAI 23.05 [1981 Rev.].

4. "INSTRUCTION NO. 6

Your verdict must be for Plaintiffs and against Defendant Maloney if you believe:

First, Defendant Maloney failed to disclose to Plaintiffs that the Hampton–Walters Promissory Note would be secured by a Second Deed of Trust, intending that Plaintiffs rely on such nondisclosure in selling their residence, and

Second, Defendant Maloney knew, prior to the closing, that the Hampton–Walters Promis-

sory Note would be secured by a Second Deed of Trust, and

Third, the fact that the Hampton–Walters Promissory Note would be secured by a Second Deed of Trust was material to the sale by Plaintiffs of their residence, and

Fourth, Plaintiffs relied on the non-disclosure in selling their residence, and

Fifth, as a direct result of such non-disclosure Plaintiffs were damaged."

Defendants assert that each of the two instructions is reversibly erroneous because:

(a) it does not include the bracketed phrase in the fifth clause of MAI 23.05, ("In so relying, plaintiffs were using ordinary care"), "in that plaintiffs' right to rely on any alleged non-disclosure was not conceded or admitted."

(b) it does not include the definition of "ordinary care" as required by MAI 23.-05, Notes on Use, No. 2.

The foregoing deficiencies, defendants argue, demonstrate that "an essential issue of fact was not hypothesized for the consideration of the jury" in the two instructions.

Was it necessary for Instruction 6 and Instruction 7 to use the language "in so relying, plaintiffs were using ordinary care" in paragraph Fourth? If so, it was necessary to define "ordinary care" because such is the command of Note 2 to the Notes on Use [1981 Rev.].

"[T]he general rule requiring the representee to exercise due diligence, ... and to avail himself of means of knowledge within reach ... does not apply if a relation of trust or confidence exists between the parties, so that one of them places peculiar reliance in the trustworthiness of the other, and in such cases the latter is under a duty to make a full and truthful disclosure of all material facts and is liable for either misrepresentation or concealment."

37 C.J.S. Fraud § 35a, p. 282. See also 37 Am.Jur.2d, Fraud and Deceit, § 254, p. 342.

As stated earlier, the client-real estate broker relationship which existed between plaintiffs and defendants was one involving trust and confidence. *Emily v. Bayne*, supra, 371 S.W.2d at 670. See also *Klika v. Albert Wenzlick Real Estate Co.*, 150 S.W.2d 18, 24 (Mo.App.1941). Such a relationship obligates the broker "to be perfectly frank with his principal, to make a complete and full disclosure of all material facts concerning the transaction ... to be loyal to his client, and to exercise the utmost fidelity and good faith towards her." *Dittmeier v. Missouri Real Estate Com-*

*mission,* 237 S.W.2d 201, 206 (Mo.App. 1951).

Long ago our supreme court said:

"The failure to use ordinary diligence to discover the fraud *may be excused* where there exists some relation of trust and confidence, as principal and agent, attorney and client, cestui que trust and trustee, between the party committing the fraud and the party affected by it, rendering it the duty of the former to disclose to the latter the true state of the transaction, and when it appears that it was through confidence in the party who committed the fraud that the other was prevented from discovering it. That is the law of righteousness and justice; it is the law in Missouri." (Emphasis added.) *Monmouth College v. Dockery,* 241 Mo. 522, 145 S.W. 785, 796 (banc 1912).

■ Substantially the same language appears in *Thompson v. Lyons*, 281 Mo. 430, 220 S.W. 942, 947 (1920). See also *Pomeroy v. Benton*, 57 Mo. 531, 542–543, 548 (1874). As stated earlier, concealment of a material fact of a transaction, which a party has a duty to disclose, constitutes fraud as actual as by affirmative misrepresentation. *Daffin v. Daffin*, supra.

■ It follows that plaintiffs had a right to rely upon Maloney's nondisclosure, as described in Instruction 6, and plaintiffs cannot be charged with a lack of ordinary care in so relying. Neither Instruction 6 nor Instruction 7 was erroneous because it did not include the bracketed phrase set forth in defendants' criticism (a). It follows that criticism (b) is without merit. Defendants' third point has no merit. See *Vinyard v. Herman,* 578 S.W.2d 938, 940–941 (Mo.App.1979).

The fourth point in defendants' joint brief, advanced solely by defendant Chaney, is that the evidence is insufficient to support the verdict against defendant Chaney, and the trial court erred in overruling his in-trial motions for a directed verdict because "plaintiffs failed to prove any intentional nondisclosure of any material fact by defendant Chaney, in view of the fact that plaintiffs chose to submit directly against defendant Chaney for his own al-

leged intentional failure to disclose a material fact rather than electing to submit on a theory of agency." This court finds merit in this contention.

Plaintiffs' verdict-directing instruction against defendant Chaney was Instruction 7, the contents of which are described in the discussion of defendants' third point. Instruction 7 made no mention of defendant Maloney or any of Maloney's alleged misconduct, including Maloney's manipulation of the documents at the closing.

Paragraph First of Instruction 7 reads: "First, Defendant Chaney failed to disclose to Plaintiffs that the Hampton–Walters Promissory Note would be secured by a Second Deed of Trust, intending that Plaintiffs rely on such non-disclosure in selling their residence, and ..." For the reasons which follow, this court holds that plaintiffs' evidence did not support the finding required by paragraph First.

As defendants' brief points out, *plaintiffs*, in a post-trial memorandum submitted to the trial court, said:

"Although Plaintiffs could have elected to submit on the agency theory and thereby sought to have had Defendant Maloney's misconduct imputed to Defendant Chaney, Plaintiffs chose to submit directly against Defendant Chaney for his own intentional failure to disclose the material fact in question. Therefore, two separate verdict directing instructions were given. Instruction No. 6 was given as to Defendant Maloney. Instruction No. 7 was given as to Defendant Chaney. Plaintiffs did not seek to have Defendant Chaney held responsible for Defendant Maloney's misconduct."

Plaintiffs called defendant Maloney and defendant Chaney as witnesses. In so doing, plaintiffs bound themselves by that portion of defendants' testimony which was elicited on direct examination and which was either uncontradicted or the only evidence on a point. *Taylor v. Riddle*, 384 S.W.2d 569 (Mo.1964); *Frazier v. Stone*, 515 S.W.2d 766, 769–770[13] (Mo.App.1974).

Referring to the telephone call which he received from attorney Ellis' secretary concerning the bank's involvement, Maloney testified, on direct examination: "I got the phone call and turned right around and told Norman about it. He was sitting right there in the front office and his response was, 'Be sure and get ahold of Joe Ellis.' In fact I believe [the secretary] told me she was going to have Joe call the Walters also and he said he had to."

Maloney further testified that he wanted the plaintiffs to "talk with attorney Ellis and blow the deal if they wasn't going to be happy with it. I knew they needed guidance on this deed of trust problem and that's the reason I wanted them to come in and see Joe."

Defendant Chaney, who was not present at the closing, had no communication with either of the plaintiffs between the signing of the March 12 agreement and the closing. Plaintiff Walters said, "I never talked to Norman Chaney about this," and Mrs. Walters testified similarly.

Under questioning by plaintiffs' counsel, defendant Chaney gave the following testimony:

"Q. You knew what was going on the same as he knew what was going on; is that correct?

A. Well, there was one—I didn't know exactly everything that was going on, except when the—Bill first told me that—that the Hamptons were going to pay cash. And then when he—Then he told me there was going to be bank money involved.

Q. Mr. Maloney told you that, right?

A. Mr. Maloney told me that.

Q. U-huh.

A. And I said, 'You'd better go talk to Joe Ellis about that right away.'

Q. How far was that—along was that in front of the closing?

A. It wasn't very long. I don't remember the exact time, but it wasn't very long.

Q. Was that at—Did that cause you reason for concern when you heard there was bank money involved?

A. No, not when he was going up to see Mr. Ellis, it didn't.

Q. Well, why did you tell him to go see Mr. Ellis?

A. Because he was concerned that there had been a change from cash to bank money.

Q. And you were concerned, too, right?

A. Well, I was concerned enough to mention to him to go see Mr. Joe Ellis, our attorney."

"[M]ere silence is fraud where the circumstances impose upon the person the duty to speak and he deliberately remains silent. However, under such circumstances, there must be a deliberate suppression of the truth and an intention to deceive." *Wheeler v. Missouri Pac. R. Co.,* 33 S.W.2d 179, 183 (Mo.App.1930). See also *DeRousse v. PPG Industries, Inc.,* 598 S.W.2d 106, 109, 110 (Mo. banc 1980); 37 C.J.S. Fraud § 23, p. 262.

The quoted testimony of Maloney and Chaney makes it clear that there was no deliberate suppression of the truth by Chaney. He wanted the Walters to know about the bank's involvement.

Plaintiffs' brief in this court says, "Defendant Chaney took no affirmative action to effect disclosure to plaintiffs *aside from telling defendant Maloney to talk to attorney Joe Ellis."* (Emphasis added.) That very "affirmative action" on the part of Chaney is inconsistent with the intent required by paragraph First of Instruction 7. Not only did plaintiffs fail to prove that intent, they proved its absence.

Viewed overall, the most damaging evidence of fraud adduced by plaintiffs was Maloney's manipulation of the documents at the closing, coupled with plaintiffs' alleged failure to receive material information at the closing. Defendant Chaney was not at the closing and there was no evidence of his knowledge of, or complicity in, the manner in which it was conducted.

■ It is true that Chaney received a commission of $1,900 by reason of the Walters–Hampton transaction. The general rule is that one who accepts the fruits of fraud with knowledge of the misrepresentations or concealment by which they were obtained will be held liable therefor, even though he did not personally participate in the fraud. 37 C.J.S. Fraud § 61, p. 349. The same text points out, however, the following principle which is applicable here: "One cannot, however, be held liable on this theory where he was ignorant of the fraud at the time he accepted its benefits and merely retained what appeared to be the legitimate proceeds of the transaction involved." See *Stewart v. Mitchell's Adm'x,* 301 Ky. 123, 190 S.W.2d 660, 662 (1945); *Occidental Life Ins. Co. v. Minton,* 181 Okl. 298, 73 P.2d 440, 442 (1937); *Hardinge v. Kuntz,* 278 Pa. 232, 122 A. 509, 511 (Pa.1923).

■ The evidence was insufficient to support that portion of the verdict which awarded plaintiffs damages against defendant Chaney.

That portion of the judgment awarding plaintiffs damages in the sum of $23,000 against defendant Norman O. Chaney is reversed; in all other respects the judgment is affirmed.

HOGAN and CROW, JJ., concur.

MAUS and PREWITT, JJ., recuse.